[Cite as *Miller v. Miller*, 2022-Ohio-1515.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

JENNIFER L. MILLER,            :        APPEAL NO. C-210414
                                              TRIAL NO. DR-1500315

      Plaintiff-Appellee,       :

   vs.                               :        *O P I N I O N.*

JOHN TROY MILLER,            :

      Defendant-Appellant.     :

Appeal From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 6, 2022

*Michaela Stagnaro*, for Plaintiff-Appellee,

*Robbins, Kelly, Patterson & Tucker, L.P.A.*, and *Barry Spaeth*, for Defendant-Appellant.

**ZAYAS, Judge.**

{¶1} Defendant-appellant John Troy Miller ("father") brings this appeal from the judgment of the Hamilton County Court of Common Pleas, Domestic Relations Division, which modified his child-support obligation. For the reasons set forth below, the judgment of the trial court is affirmed.

## Procedural History

{¶2} Father and plaintiff-appellee Jennifer L. Miller ("mother") were married in 2006. The parties' marriage was terminated by decree of divorce in July 2016. Under the terms of the divorce decree, the parties were to share custody of the parties' two children and father was ordered to pay child support. A decree of shared parenting was also entered at the time of the divorce decree. In October of 2019, father's child-support obligation was modified, pursuant to agreed amendments to the shared-parenting plan, to $2,953.20 per month, based on an annual gross income for father of $393,960.

{¶3} On May 13, 2020, father filed a motion to modify his child-support obligation based on a "substantial and involuntary" decrease in income. On July 7, 2020, father filed a motion for an emergency hearing to temporarily modify his child-support obligation, claiming he paid over 51 percent of his gross monthly income in child support when the children spent approximately 50 percent of their time residing with him. A hearing on both motions was held before a magistrate on August 21, 2020. Before a decision on the motions was entered by the magistrate, father filed another motion, on September 16, 2020, for an emergency hearing to further modify his child-support obligation, claiming that his employment had been terminated. A hearing was held on this motion on October 27, 2020.

{¶4} The magistrate entered a decision on all three motions on May 3, 2021. The magistrate granted the motions to reduce father's child-support obligation, and ordered that he pay $1,934.10 per month. In doing so, the magistrate found father to be voluntarily underemployed and imputed to father the annual income of his latest position of employment. The magistrate's order expressly did not deviate from the child-support amount computed on the applicable worksheet. Father timely filed objections to the magistrate's decision, but the trial court overruled the objections on June 29, 2021, and adopted the magistrate's decision. Of importance, the trial court stated, "The magistrate considered the effect the COVID pandemic has had on [father's] employment, but [father] did not provide convincing evidence that he is unable or will be unable to make the amount of income that he was imputed at in the Magistrate's decision, especially considering his sales experience and previous success." Father timely filed a notice of appeal from the trial court's decision and now raises a sole assignment of error for our review, arguing that the trial court abused its discretion in denying his motions to modify his child-support obligation.

**Factual Background**

*First Change in Circumstance*

{¶5} Father testified that, prior to May 2020, he had a small boutique media agency called Division One Sports. With this agency, he was paid commissions for brokering media deals on behalf of advertisers, mainly for "in-venue signage." For many years, Geico was his largest client until Geico decided to take its sports marketing in-house in March of 2018. Father testified that he entered into a settlement agreement with Geico, which agreed to pay him for deals he still "had in the pipeline." However, he was no longer able to negotiate on behalf of Geico. He also lost income when another client, Kumho Tire, cut its budget for the 2018-2019 season.

3

Father testified that 80 percent of his total gross income was attributable to these two advertisers. Father also worked as a commission sales consultant for Access Sports Media, which was ultimately absorbed by ISM Connect ("ISM") during the COVID-19 pandemic.

{¶6} Father averred that the sports marketing business "became null and void" when the pandemic hit because no fans were in the arenas. In an effort to earn more income, he brokered a deal with a "CBD" company out of Baltimore to do advertisements on a subscription-based platform, FloSports. The deal only made a total of $2,300 in sales, of which he earned about ten percent. Father testified that the possibly of this deal generating money was "not looking very good at all." He was able to use his contacts to obtain a position at ISM after it acquired Access Sports Media. He started this position on May 11, 2020. His salary at ISM was $96,000, plus ten percent net commissions. Leo John Naioti, the senior director of human resources for ISM, testified that father's position was senior director of sales. With this position, father was responsible for acquiring advertising media sales.

{¶7} Father asserted, and Naioti confirmed, that he had not earned any commissions in connection with his employment at ISM. Naioti denied observing any behavior that would indicate father was not exerting his best efforts to obtain sales for the company. Naioti testified that he could not guarantee that father's position was secure going forward due to the impact the pandemic had on the security of sales positions in the business. Father indicated his position was in "more of a 2021 planning stage" in the hopes that people would be back to the arenas.

{¶8} Father denied receiving any income aside from his salary at ISM and denied having any other source of income in the future. He asserted that it was unlikely he would receive the last two quarterly payments that he was scheduled to

receive in 2020 under the Geico settlement agreement. He believed that, under the terms of the agreement, Geico could elect to opt out of the underlying agreements requiring him to be paid; however, he denied receiving any written documentation from Geico "to that effect." Father denied being aware of anything else he could be doing to earn more than his salary at ISM. His business, Division One Sports, was still operational; however, father testified that there was "no business there." He agreed he still had the capability to work through this business but opined that he would have to leave his current position at ISM because it would create a conflict of interest.

*Second Change in Circumstance*

{¶9} Father was let go from his position at ISM on September 16, 2020, after his position was eliminated. He received payment from ISM through the end of September pursuant to a separation agreement. He applied for unemployment compensation, but his claim was denied due to lack of qualifying employment. Regarding his efforts to obtain new employment, father testified that he reached out via phone, email, and LinkedIn to people in the industry to find a position. He averred that he was not qualified for a majority of the jobs that were available. He additionally asserted that almost everyone he spoke within his industry was either furloughed or laid off. He applied for a position in sales, outside the "sports world," at NetJets but was told that he was not qualified based on his background. He claimed he did not have any clients right now at his business, Division One Sports, but asserted that he had been looking for potential clients. He agreed that he is going to continue to search for employment until he is successful. He denied utilizing any other platform, other than LinkedIn, to look for positions. Father submitted a list of 20 people or entities that he contacted to see if a position was available.

{**¶10**} Mother lost her income due to undergoing treatment for metastatic breast cancer. She testified that she used the child-support payments to pay for the children's expenses. She averred that father's testimony about his sales experience was inaccurate. She testified that, based on her experience during their marriage of 20 years, father had the ability to supplement his income and find money when he needed to. She claimed that father had a client, DeSantis, that he would do promotions and parties for. She opined that father "made a good half a million dollars that time alone." She claimed that father's experience was not just in sales and stated that it was her opinion that father was not looking for employment.

## Law and Analysis

### *Standard of Review*

{**¶11**} Decisions regarding child-support obligations are within the discretion of the trial court and will not be disturbed absent an abuse of discretion. *Morrow v. Becker*, 138 Ohio St.3d 11, 2013-Ohio-4542, 3 N.E.3d 144, ¶ 9, citing *Pauly v. Pauly*, 80 Ohio St.3d 386, 390, 686 N.E.2d 1108 (1997). A finding of abuse of discretion requires more than just mere error; it requires that the court's decision be unreasonable, arbitrary, or unconscionable. *Id.*, citing *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

### *Child-Support Modification*

{**¶12**} In any action in which a child-support order is modified, the court must "calculate the amount of the parents' child support and cash medical support in accordance with the basic child support schedule, the applicable worksheet, and other provisions of Chapter 3119. of the Revised Code." R.C. 3119.02; *see* R.C. 3119.021; R.C. 3119.022; Ohio Adm.Code 2101:12-1-17. In doing so, the court must first determine the annual income of each parent. *Sweeney v. Sweeny*, 2019-Ohio-1750, 135 N.E.3d

1189, ¶ 23 (1st Dist.), citing *Cwik v. Cwik*, 1st Dist. Hamilton No. C-090843, 2011-Ohio-463, ¶ 89. " 'Income' means either of the following: (a) For a parent who is employed to full capacity, the gross income of the parent; (b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent." R.C. 3119.01(C)(9). " Gross income" means "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable * * *." R.C. 3119.01(C)(12). "Potential income" for a parent who is voluntarily unemployed or underemployed means "imputed income that the court * * * determines the parent would have earned if fully employed * * *," and "imputed income from any nonincome-producing assets of a parent * * *." R.C. 3119.01(C)(17).

{¶13} "The court *may* order an amount of child support that deviates from the amount of child support that would otherwise result from use of the basic child support schedule and the applicable worksheet if, after considering the factors and criteria set forth in section 3119.23 of the Revised Code, the court determines that the amount calculated pursuant to the basic child support schedule and the applicable worksheet would be unjust or inappropriate and therefore not in the best interest of the child." (Emphasis added.) R.C. 3119.22. "If the court deviates, the court must enter in the journal the amount of child support calculated pursuant to the basic child-support schedule and the applicable worksheet, its determination that the amount would be unjust or inappropriate and therefore not in the best interest of the child, and findings of fact supporting that determination." *Id.*

*Voluntary Underemployment*

**{¶14}** Father argues that the trial court abused its discretion in determining that he was voluntarily underemployed. Whether a parent is voluntarily underemployed and the amount of "potential income" to be imputed to a parent are matters to be decided by the trial court based upon the facts and circumstances of each case. *Rock v. Cabral*, 67 Ohio St.3d 108, 616 N.E.2d 218 (1993), syllabus. "Voluntarily" is defined as " '[d]one by design or intention, intentional, proposed, intended, or not accidental. Intentionally or without coercion.' " *Id.* at fn. 2. The test for determining whether a parent is voluntarily underemployed is not limited to whether the change was voluntary; the test also includes whether the change " 'was made with due regard to the obligor's income-producing abilities and her or his duty to provide for the continuing needs of the child or children concerned.' " *Martindale v. Martindale*, 4th Dist. Athens No. 18CA17, 2019-Ohio-3028, ¶ 53, quoting *King v. King*, 4th Dist. Jackson No. 12CA2, 2013-Ohio-3426, ¶ 21. The ultimate "design and purpose" is to protect and ensure the best interests of the child or children involved. *Rock* at 111.

**{¶15}** "Unless it would be unjust or inappropriate and therefore not in the best interests of the child, a court * * * shall not determine a parent to be voluntarily unemployed or underemployed and shall not impute income to that parent if * * * the parent has proven that the parent has made continuous and diligent efforts without success to find and accept employment, including temporary employment, part-time employment, or employment at less than the parent's previous salary or wage." R.C. 3119.05(I)(3).

**{¶16}** Here, the trial court found that father did not provide convincing evidence that he was unable to obtain new employment similar in pay to the position he was recently let go from and imputed income to him accordingly. The evidence

submitted by father was his own testimony, an email from father to his counsel listing 20 people or entities he had reached out to, three emails showing his communication to three of those people or entities, and an email showing he was rejected for a position with one of those entities.

{¶17} Father cites to *English v. Rubino*, 8th Dist. Cuyahoga No. 68901, 1996 Ohio App. LEXIS 1415 (April 4, 1996), and argues that this evidence does not support a determination that he voluntarily failed to look for work. In *Rubino*, the child-support obligor was terminated from his position as the vice president of a bank on August 1, 1991. *Id.* at *3. He was denied unemployment compensation after a finding that he was terminated for just cause. *Id.* The obligor testified that he made diligent efforts to look for work but limited his search to jobs in the field of banking and law. *Id.* He also applied for a few jobs outside of these fields, such as a convenience store clerk and gas station attendant. *Id.* The obligor graduated from law school in the summer of 1991 and passed the bar examination in May of 1992. *Id.* The referee found him to be voluntarily underemployed and capable of working as an attorney, and accordingly imputed income to him similar to what he was making at the bank. *Id.* at *3-4. The trial court adopted the decision of the referee. *Id.* at *4. The court of appeals reversed this decision, finding that the trial court abused its discretion. *Id.* at *5. The court stated,

> Appellant testified he made every effort to find work in the fields of banking and law, and also applied for a few other types of work. *This testimony was uncontradicted and the referee's report did not state that this testimony was not credible.* * * * The fact that appellant had not found any work in ten months is insufficient by itself to show appellant did not make diligent efforts to look for work, without any

evidence of available job opportunities.  The evidence does not support a determination that appellant voluntarily failed to look for work.

(Emphasis added.)  (Citation omitted.)  *Id.*

**{¶18}** The case at bar is distinguishable from *Rubino*.  First, the trial court expressly found that father did not provide "convincing evidence."  The trial court was in the best position to determine credibility and weigh the evidence.  *See Getreu v. Getreu*, 5th Dist. Licking No. 2020 CA 00083, 2021-Ohio-2761, ¶ 35 ("Issues relating to the credibility of the witnesses and the weight to be given the evidence are primarily for the trier of fact."); *Cummin v. Cummin*, 2015-Ohio-5482, 55 N.E.3d 467, ¶ 24 (4th Dist.)  ("It was within the trial court's discretion to make credibility determinations with respect to appellant's claimed reduction in income.").  Additionally, mother contradicted father's assertions and testified that, based on her history of 20 years of marriage to father, she knew he was capable of finding work when he needed to and believed that he was not looking for employment.

**{¶19}** Father was only found to be voluntarily underemployed after his position was eliminated at ISM.  Outside of father's own assertions, the only evidence in the record of any efforts to find new employment was four emails: three emails showing that father reached out to connections to let them know that he was seeking employment and one email that showed he had applied for an open position.  Based on the foregoing, we cannot determine that the trial court abused its discretion in finding the evidence insufficient to prove that father made "continuous and diligent" efforts to find and accept employment since he lost his position at ISM.  Therefore, we cannot determine the trial court abused its discretion in finding father to be voluntarily underemployed.  *See* R.C. 3119.05(I)(3).

*Imputed Income*

**{¶20}** Father next argues that the trial court abused its discretion in imputing income to him in an amount not supported by the record. When a court determines that a parent is voluntarily unemployed or voluntarily underemployed, any "potential income" to be imputed, based on what a parent would have earned if fully employed, must be determined from the criteria listed in R.C. 3119.01(C)(17)(a)(i)-(xi). This includes: (1) the parent's prior employment experience; (2) the parent's education; (3) the parent's physical and mental disabilities, if any; (4) the availability of employment in the geographic area in which the parent resides; (5) the prevailing wage and salary levels in the geographic area in which the parent resides; (6) the parent's special skills and training; (7) whether there is evidence that the parent has the ability to earn the imputed income; (8) the age and special needs of the child for whom child support is being calculated; (9) the parent's increased earning capacity because of experience; (10) the parent's decreased earning capacity because of a felony conviction; and (11) any other relevant factor. R.C. 3119.01(C)(17)(a)(i)-(xi).

**{¶21}** Consideration of the relevant factors in the statute is mandatory; however, "the trial court is required neither to hear evidence on each factor nor discuss each factor in its analysis." *McFarland v. McFarland*, 12th Dist. Butler No. CA2018-05-098, 2019-Ohio-2673, ¶ 12, citing *Justice v. Justice*, 12th Dist. Warren No. CA2006-11-134, 2007-Ohio-5186, ¶ 13. Thus, a trial court does not abuse its discretion in limiting its determination to the evidence presented, even when this results in the trial court not considering every statutory factor. *See Rice v. Rice*, 11th Dist. Geauga Nos. 2006-G-2716 and 2006-G-2717, 2007-Ohio-2056, ¶ 54-56.

**{¶22}** In the magistrate's decision, adopted by the trial court, the magistrate found that father had historically earned between $250,000 to $350,000, had historically been successful in his business, and had consistently worked full-time.

Additionally, the magistrate found that no evidence was presented to indicate that father was unable to work "medically or otherwise." Finally, the magistrate found that father was able to find a position earning $96,000 plus commission during the pandemic and noted that father had experience in sales and previous success. While not every factor was explicitly discussed, it is clear that the trial court considered the relevant factors.

{¶23} Father argues that the trial court erred in finding that his total income for 2020 was $193,891, because this amount is "far beyond" what father actually made in 2020. In determining father's gross income, the magistrate included his $96,000 annual salary from his employment at ISM, his latest employer, and $97,891 in self-employment income. The magistrate's calculation of self-employment income was based on the settlement and release agreement between father, as Division One Sports, LLC, and Geico. The agreement reflects that father will be paid quarterly commissions in accordance with the exhibit attached to the agreement. Pursuant to the exhibit, father was to receive a total of $97,891, in quarterly increments, from Geico in 2020. Evidence was presented that father had already received the first payment of $63,483. While the agreement does contain language that would allow future payments to father to cease if any of the underlying agreements which formed the basis for the commissions were terminated, the agreement also reflects that Geico must notify father "regarding its election to opt-out of any of the aforementioned agreements reflected" in the exhibit attached to the agreement. Father testified at the initial hearing that he had not received any communication "to that effect." Thus, the evidence supports the trial court's finding that father was still entitled to receive the remaining amount from Geico. Additionally, although the magistrate stated that the future Geico payments would be "imputed" to father, the record indicates that the trial

court was more likely attributing the future payments to father as "potential cash flow" under R.C. 3119.01(C)(12), rather than "potential income" under R.C. 3119.01 (C)(17). *See Misra v. Mishra*, 2018-Ohio-5139, 126 N.E.3d 367, ¶ 35 (10th Dist.), citing *Smart v. Smart*, 3d Dist. Shelby No. 17-07-10, 2008-Ohio-1996, ¶ 19. Potential cash flow may be included in the determination of gross income without a finding of voluntary underemployment. *Id.*

{¶24} Therefore, the only income actually "imputed" to father was income equivalent to his annual salary at ISM for the period after his position was eliminated. The magistrate used father's salary at ISM as evidence of the type of employment currently available to father as father was able to obtain this position at this salary level in his career field during the pandemic. The evidence in the record regarding father's annual salary with ISM included an email and testimony of Leo Naioti, as well as father's own testimony and earning statements from ISM. Thus, the magistrate's income determination, adopted by the trial court, is supported by evidence in the record. Accordingly, we cannot determine that the trial court abused its discretion in imputing $96,000 in income to the father for the period after his position was eliminated.

*Extended Parenting-Time Deviation*

{¶25} Father further argues that the trial court abused its discretion by not granting a deviation due to his "extended" parenting time with the parties' son. Father's argument appears to be derivative of the trial court's authority to grant a deviation under R.C. 3119.22, which provides that a trial court *may* order a deviation from the applicable worksheet if, after considering the factors in R.C. 3119.23, the

court determines that the amount calculated would be "unjust or inappropriate" and therefore not in the best interest of the children. *See* R.C. 3119.22. Under the plain language of R.C. 3119.22, a trial court is not obligated to order a deviation. *See In re Custody of Harris*, 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, ¶ 60, citing *Coleman v. Campbell*, 11th Dist. Geauga No. 2001-G-2401, 2002-Ohio-3841, ¶ 16 (Finding that a deviation under R.C. 3119.22 is not mandatory and "clearly discretionary."); *Zeitler v. Zeitler*, 9th Dist. Lorain No. 04CA008444, 2004-Ohio-5551, ¶ 14 (Finding that, under R.C. 3119.22, a trial court is "under no obligation to deviate, no matter what its findings may be."). Father points to no authority which states otherwise. The magistrate's decision, adopted by the trial court, expressly declined to deviate from the determination on the child-support worksheet and we cannot determine this was an abuse of discretion as the trial court was under no obligation to grant a deviation.

### *Separate Rulings*

{¶26} Father finally argues that the trial court abused its discretion when it entered an order with findings that one annual income should be imputed to him for all of 2020, despite two "separate and significant" changes in circumstances. Father cites to *Cooper v. Cooper*, 12th Dist. Clermont No. CA2003-05-038, 2004-Ohio-1368, ¶ 20-22, *overruled in part on other grounds*, *Brandner v. Brandner*, 12th Dist. Butler No. CA2011-07-136, 2012-Ohio-3043, ¶ 22, for the proposition that a period of unemployment followed by a subsequent change in employment results in separate changes of circumstances to warrant an additional modification of support. However, in *Cooper*, the obligor had two distinct periods where his income was different. *See id.* at ¶ 4, 6. Here, the trial court, in essence, determined that father's income was the same for both periods.

{¶27} The magistrate's decision, adopted by the trial court, reflects that the court considered both changes in circumstances but rejected any further modification—beyond the modification warranted by the first change in circumstance—because it found father to be voluntarily underemployed at the time of the final hearing. It accordingly imputed a salary to father equivalent to his salary at ISM, which was the basis for the initial modification. Thus, after imputing this salary to father, the income determination based on the second change in circumstance would be the same as the determination made under the initial motions for the first change in circumstance. Consequently, it was unnecessary for the trial court to make "two separate and distinct" orders as it essentially denied father's request for any further modification to the child-support obligation, beyond what it was already granting under the first two motions. Instead, the trial court entered one order, effective the date that the first motion was filed. We cannot determine this was an abuse of discretion.

## Conclusion

{¶28} Having reviewed all of father's issues presented for review and finding no merit to any of father's arguments, we overrule the sole assignment of error. Accordingly, we affirm the judgment of the trial court.

Judgment affirmed.

**MYERS, P.J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its own entry this date.